Pamela S. LAWRENCE, Plaintiff,

v.

JACKSON MACK SALES, INC., Northbrook Insurance Company and Southern Marketing Services, Defendants.

Civil A. No. J89–0573(L).

United States District Court,
for the S. District Mississippi,
Jackson Division.

Nov. 2, 1992.

Paul Koerber, Jackson, MS, William Featherston, Ridgeland, MS, for plaintiff.

Steven H. Begley, Wells, Wells, Marble & Hurst, Keith Ralston, Heidelberg & Woodliff, Jackson, MS, for defendants.

## MEMORANDUM OPINION AND ORDER

TOM S. LEE, District Judge.

Plaintiff Pamela S. Lawrence brought the present action seeking benefits pursuant to an employee benefit plan covered by the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1132(e), as amended by the Consolidated Omnibus Budget Reconciliation Act (COBRA), 29 U.S.C. § 1161 *et seq.*, and damages relating to the failure to pay such benefits as were allegedly due, including statutory penalties for failure to provide notice of her COBRA rights. The case is now before the Court on the motion of defendant Jackson Mack Sales, Inc. (Jackson Mack) for partial summary judgment, the motions of defendants Northbrook Life Insurance Company (Northbrook) and Southern Marketing Services (Southern Marketing) for summary judgment and Northbrook's motion for summary judgment as to the cross-claim asserted against it by Jackson Mack. Plaintiff Pamela S. Lawrence has responded to defendants' motions, and Jackson Mack has responded to Northbrook's

motion. The court, having considered the motions and responses, along with memoranda of authorities and attachments thereto, is of the opinion that defendants' motions for summary judgment as to Lawrence's claims should be granted in part and denied in part and that Northbrook's motion as to Jackson Mack's cross-claim should be denied.

## FACTS AND PROCEDURAL HISTORY

On November 1, 1985, Jackson Mack established an employee welfare benefit plan for its employees and their dependents.[1] The plan, with effective dates of November 1, 1985 to December 31, 1988, was funded through group insurance coverage issued by Northbrook to the Trustee of the Northbrook Multiple Employer Trust for the Retail Industry. The group insurance coverage provided life insurance, accidental death, dismemberment, weekly indemnity and major medical insurance benefits to Jackson Mack employees and their beneficiaries. Southern Marketing processed and paid eligible claims under the Group Plan.

Phillip B. "Tiny" Lawrence, Jr., a managerial employee of Jackson Mack and Pamela Lawrence's former husband, participated in the plan maintained by Jackson Mack, and plaintiff and her children, as Tiny Lawrence's dependents, were covered under the plan from the time coverage was extended to Tiny Lawrence in November 1985. On December 25, 1986, over a year after the inception of the employee benefit plan, Tiny Lawrence informed his wife that he wanted a divorce and approximately a month later, on February 9, 1987, Pamela and Tiny Lawrence filed a joint complaint for divorce in the Chancery Court of Madison County, Mississippi. The divorce was finalized on May 6, 1987.

At some point after plaintiff and her husband filed for divorce but prior to the entry of the divorce decree, plaintiff consulted with her divorce attorney about whether she could continue coverage under the benefit plan after her divorce. Her attorney advised her to contact Jackson Mack to determine if the plan provided a continuation or conversion policy that would allow her to remain a plan beneficiary. Lawrence asserts that in accordance with her attorney's advice, she contacted the insurance clerk at Jackson Mack, Bonny Kelly, who, in response to plaintiff's inquiry, informed her that coverage under the plan and insurance policies would cease upon the finalization of her divorce and that plaintiff could not continue the coverage by paying premiums for the coverage.[2] Following her conversation with Kelly, plaintiff communicated with an insurance clerk for Southern Marketing, who confirmed to plaintiff that her coverage would not continue after plaintiff's divorce from her husband. On or about May 30, 1987, plaintiff's coverage under the health insurance policy of the employee benefit plan was terminated.

Soon after her divorce from Tiny and the termination of her insurance coverage, plaintiff began experiencing health problems. In August 1987, she collapsed while on a trip to Dallas, Texas, and later learned from her physician that she had suffered a heart attack. In late November of that year, she underwent a heart catherization and in January 1988, plaintiff had triple bypass cardiovascular surgery. Subsequently, she developed rheumatic fever due to an infection at the graph site and further treatment was required.

Without insurance coverage, Lawrence was unable to pay her medical expenses and on

---

**1.** ERISA defines an "employee welfare benefit plan" as:

> any plan, fund or program ... established or maintained by an employer ... to the extent that such plan, fund or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise ... medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment....

29 U.S.C. § 1002(1). It is undisputed that the plan provided by Jackson Mack, funded by Northbrook and for which claims were processed by Southern Marketing, was an employee benefit plan governed by the provisions of ERISA, and a review of the plan documents submitted indicates that the plan was indeed an ERISA plan.

**2.** According to Lawrence, she specifically asked Kelly if it was possible for her to pay premiums and keep the insurance coverage she enjoyed by virtue of her husband's plan, but was told that she could not and that her coverage would terminate at the end of the month in which the divorce was finalized.

May 25, 1988, filed for bankruptcy protection under Chapter 7 of Title 11 of the United States Code. *In re Pamela A. Lawrence,* Bankruptcy Case No. 8801547 (Bankr. S.D.Miss.1988). By order of the bankruptcy court, plaintiff was released from all dischargeable debts on October 14, 1988.

On October 6, 1989, Lawrence filed suit against defendants Jackson Mack, Northbrook and Southern Marketing [3] and on October 4, 1990 filed the amended complaint that is the basis of the motions presently under consideration.[4]

## PLAINTIFF'S CAUSES OF ACTION

Plaintiff alleges in count 1 of her amended complaint that following the enactment of COBRA, defendants failed to provide her a "general COBRA notification" apprising Lawrence of her right to continuation coverage under the employee benefit plan and thus violated COBRA's notification requirements set forth in 29 U.S.C. § 1161. For this alleged violation, she seeks an award of statutory penalties provided by 29 U.S.C. § 1132(c)(1).[5] In count 2, she alleges that after receiving notice of plaintiff's divorce, a "qualifying event" under 29 U.S.C. § 1163(3), defendants failed to offer to continue or convert her insurance coverage, as mandated by 29 U.S.C. § 1162. As damages for this alleged violation, Lawrence seeks to recover (1) all benefits which would have been due under a continued or converted insurance policy, pursuant to 29 U.S.C. § 1132(a)(1)(B); (2) all relief which may be granted under 29 U.S.C. § 1132(a)(2) for breach of fiduciary duties imposed by 29 U.S.C. §§ 1104 and 1109; (3) $1 million as incidental and consequential damages, pursuant to 29 U.S.C.

§ 1132(a)(3); (4) future benefits under the plan which will be due on medical and medically-related expenses, pursuant to 29 U.S.C. § 1132(a)(1)(B); (5) all amounts necessary to restore her to the position she held prior to defendants' alleged breaches, pursuant to 29 U.S.C. § 1132(a)(3); (6) attorneys' fees pursuant to 29 U.S.C. § 1132(g); (7) equitable relief pursuant to 29 U.S.C. § 1132(a)(3); and (8) prejudgment interest.

Count 3 of plaintiff's amended complaint alleges that defendants breached their duties as fiduciaries or co-fiduciaries by failing to comply with 29 U.S.C. §§ 1104 and 1105, and demands actual damages of $250,000 in accordance with 29 U.S.C. § 1132(a)(3), as well as an accounting. In this count, plaintiff charges that for all of the breaches of the duties owed to her, defendants are jointly and severally liable as provided by 29 U.S.C. § 1109. In addition to her ERISA claims, Lawrence asserts in count 4 a state law claim of tortious interference with her contractual and statutory rights to continuation or converted insurance coverage, for which she seeks actual damages in the amount of $200,-000 and punitive damages of $1 million. Jackson Mack has moved for partial summary judgment and Northbrook and Southern Marketing have moved for summary judgment as to plaintiff's claims.[6]

## COBRA

On July 1, 1986, the Consolidated Omnibus Budget Reconciliation Act (COBRA), 29 U.S.C. § 1161 *et seq.,* became effective. COBRA, which amended ERISA, mandated that employers sponsoring group health plans which are part of ERISA employee benefit plans provide continuation or conversion insurance coverage to beneficiaries who would

**3.** Plaintiff also named as a defendant Bill Henley, an insurance agent who acted on behalf of Northbrook. Plaintiff's claims against Henley were dismissed without prejudice by order entered August 6, 1991.

**4.** Chief Judge William H. Barbour, to whom the case was initially assigned, previously denied plaintiff's motion to amend her complaint to assert a derivative action under ERISA, as amended by COBRA, on behalf of all plan participants and beneficiaries, and to join additional defendants. *See* Memorandum Opinion and Order, August 31, 1990.

**5.** That statute provides:
 Any administrator … who fails to meet the requirements of paragraph (1) or (4) of section 1166 of this title … with respect to a participant or beneficiary … may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper.

**6.** The court will treat separately Northbrook's motion for summary judgment as to Jackson Mack's cross-claim against it. *See infra* at p. 791.

otherwise lose coverage as a result of a "qualifying event," such as death of a covered employee, divorce from a covered employee, or termination from employment. 29 U.S.C. § 1161(a).[7] COBRA includes two notification requirements, both of which are relevant to the present action. First, COBRA requires that at the inception of a group health plan, beneficiaries be provided a "general notification" of their right to elect to continue or convert their coverage under the plan. 29 U.S.C. § 1166(a)(1).[8] In addition, upon being notified by the employee or beneficiary of the occurrence of a "qualifying event" under 29 U.S.C. § 1163, which includes "divorce ... of the covered employee from the employee's spouse," the plan administrator must apprise the beneficiary or employee of his or her entitlement to continuation coverage. 29 U.S.C. 1166(a)(4)(B).[9]

## EFFECT OF BANKRUPTCY ON PLAINTIFF'S ERISA CLAIMS

As indicated, plaintiff's various claims in this lawsuit are based upon her contention that defendants failed to provide her notice of her rights under COBRA, as required by 29 U.S.C. § 1166(a)(1) and (4), and thus deprived her of insurance coverage to which she was entitled under COBRA. Allegedly as a result of defendants' failure to afford her such coverage, plaintiff was forced to file for protection under the Bankruptcy Code on May 25, 1988. A final bankruptcy decree discharging her debts was entered on October 14, 1988. Defendants contend in their present motions that all of the claims asserted by Lawrence in this action which accrued prior May 25, 1988, the date of her filing for protection under the Bankruptcy Code, may not now be pursued by plaintiff since all such claims were assigned by operation of law to her bankruptcy estate. The court's first task in resolving the pending motions is to determine the effect of plaintiff's bankruptcy petition on the claims she is asserting in this lawsuit.[10] Specifically, the court must determine whether plaintiff may pursue the claims she has asserted or whether those claims must be pursued, if at all, by the bankruptcy trustee.

7. Specifically, COBRA provides:

The plan sponsor of each group health plan shall provide, in accordance with this part, that each qualified beneficiary who would lose coverage under the plan as a result of a qualifying event is entitled, under the plan, to elect, within the election period, continuation coverage under the plan.

29 U.S.C. § 1161(a).

8. Section 1166(a)(1) requires that "the group health plan ... provide, at the time of commencement of coverage under the plan, written notice to each covered employee and spouse of the employee (if any) of the rights provided under this subsection." (footnote omitted).

9. Section (a)(4)(B) provides that the administrator must notify "in the case of a qualifying event ... where the covered employee notifies the administrator ..., any qualified beneficiary with respect to such event, of such beneficiary's rights under this subsection."

10. In addition to her claim for recovery of the benefits that would have been provided had she been afforded the coverage to which she was entitled under COBRA, Lawrence has asserted claims for statutory penalties for defendants' alleged failure to provide her general COBRA notification and qualifying event notification of her rights to continue or convert her health insurance coverage. Generally, penalty claims do not become the property of the bankruptcy estate.

*See In re Wood,* 643 F.2d 188 (5th Cir.1980). Though the Fifth Circuit has described the ERISA section at issue as a "penalty provision," *see Fisher v. Metropolitan Life Ins. Co.,* 895 F.2d 1073, 1077 (5th Cir.1990) (in deciding whether scribbled note constituted request for plan documents, court noted that "[a]s a penalty provision section 1132(c) must be strictly construed."), a review of case law describing penalty statutes for bankruptcy purposes leads the court to conclude that Lawrence's claim is not a penalty claim which would have been excepted from transfer to her bankruptcy estate. In *Wood,* 643 F.2d 188 (5th Cir.1980), the Fifth Circuit, in determining that a claim for statutory damages pursuant to the Truth in Lending Act, 15 U.S.C. § 1640(a), was remedial rather than penal and thus would survive the death of the debtor and be transferable to the bankruptcy estate, utilized the following test:

The test whether a law is penal, in the strict and primary sense, is whether the wrong sought to be redressed is a wrong to the public, or a wrong to the individual, according to the familiar classification of Blackstone: "Wrongs are divisible into two sorts of species: *private wrongs and public wrongs.* The former are an infringement or privation of the private or civil rights belonging to individuals; and are thereupon frequently termed *civil injuries:* the latter are a breach and violation of public rights and duties, which affect the whole community, considered as a community; and are distinguished

■ The filing of a bankruptcy petition creates a bankruptcy estate. The property of which a bankruptcy estate is comprised is listed at 11 U.S.C. § 541(a), which provides in pertinent part:

(a) The commencement of a case under section 301, 302 or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:

(1) Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case.

Section 541(a)(1), therefore, provides that legal or equitable interests held by a debtor at the commencement of a bankruptcy case become the property of the bankruptcy estate.

Courts have uniformly held that the phrase "legal or equitable interests" encompasses causes of action. *See, e.g., Bauer v. Commerce Union Bank,* 859 F.2d 438, 441 (6th Cir.1988), *cert. denied,* 489 U.S. 1079, 109 S.Ct. 1531, 103 L.Ed.2d 836 (1989) (" 'interests of the debtor in property' include 'causes of action' ") (citations omitted); *Louisiana World Exposition v. Federal Ins. Co.,* 858 F.2d 233, 245 (5th Cir.1988) ("The scope of the term 'property of the estate' is very broad. Section 541(a)(1)'s reference to 'all legal or equitable interests of the debtor in property' includes causes of action belonging to the debtor at the time the case is commenced.") (citations omitted); *In re Ozark Restaurant Equip. Co.,* 816 F.2d 1222, 1225 (8th Cir.), *cert. denied,* 484 U.S. 848, 108 S.Ct. 147, 98 L.Ed.2d 102 (1987) (same); *In re Mortgage America Corp.,* 714 F.2d 1266, 1274 (5th Cir.1983) ("Even on its face, section

541(a)(1) is all-encompassing, and Congress meant for it to be construed commensurately."); *In re Smith,* 640 F.2d 888, 890 (7th Cir.1981) (bankruptcy estate includes truth-in-lending causes of action).

■ Causes of action need not be formally filed prior to the commencement of a bankruptcy case to become property of the bankruptcy estate. *See, e.g., Wissman v. Pittsburgh Nat'l Bank,* 942 F.2d 867, 869 (4th Cir.1991) ("possible claim" not pending at time of filing of bankruptcy petition became property of the estate upon filing of petition); *Miller v. Shallowford Community Hosp., Inc.,* 767 F.2d 1556, 1561 (11th Cir. 1985) (cause of action for personal injury protection insurance existed at time of filing of bankruptcy petition, even though debtor had not formally filed action); *In re Cottrell,* 82 B.R. 45, 46 (W.D.Ky.1987) (tort action involving automobile accident that occurred prior to filing of bankruptcy petition existed at time of filing of petition, even though action was not formally commenced at time of bankruptcy petition filing); *In re Bell & Beckwith,* 64 B.R. 144, 147 (Bankr.N.D.Ohio 1986) ("[A]ny cause of action which has accrued to the Debtor as of the filing of the petition is property of the estate and may only be prosecuted on behalf of the estate."). Accordingly, a cause of action belonging to a debtor that existed at the time of the filing of a bankruptcy petition becomes property of the bankruptcy estate and may only be prosecuted by the trustee of the bankruptcy estate, the real party in interest under Rule 17(a) of the Federal Rules of Civil Procedure. The issue to be decided, therefore, is whether some or all of plaintiff's claims accrued prior to her discharge in bankruptcy.[11] Those

---

by the harsher appellation of *crimes* and *misdemeanors.*" 3 Bl.Com. 2.
*Wood,* 643 F.2d at 191 (emphasis in original). As the statute at issue in the case *sub judice* was not enacted for the benefit of the public as a whole, but rather for a discrete group, benefit plan participants, Lawrence's claims for statutory damages would not have been transferable to the bankruptcy estate, unless they had not accrued as of the date of Lawrence's filing for bankruptcy protection.

11. Plaintiff contends that the causes of action asserted in the present action were abandoned by the bankruptcy trustee, such that she is now free

to pursue them irrespective of when they accrued. 11 U.S.C. § 521(1) requires that the debtor "file a list of creditors, and unless the court orders otherwise, a schedule of assets and liabilities, a schedule of current income and current expenditures, and a statement of the debtor's financial affairs." And 11 U.S.C. § 554(c) provides: "Unless the court orders otherwise, any property scheduled under section 521(1) of this title not otherwise administered at the time of the closing of a case is abandoned to the debtor and administered for purposes of section 350 of this title. As Lawrence did not schedule the claims that she asserts in this action as assets in her

which did, if any, are property of the bankruptcy estate and may only be prosecuted by the bankruptcy trustee.[12]

■ The Fifth Circuit has held that an ERISA cause of action pursuant to 29 U.S.C. 1132(a)(1)(B) does not accrue for statute of limitations purposes until a claim for benefits has been denied. *Simmons v. Willcox*, 911 F.2d 1077, 1081 (5th Cir.1990) (noting "the general rule that no cause of action accrues under ERISA until … an application is actually filed and denied"); *Paris v. Profit Sharing Plan*, 637 F.2d 357, 361 (5th Cir.), cert. denied, 454 U.S. 836, 102 S.Ct. 140, 70 L.Ed.2d 117 (1981) ("[A] cause of action does not become a presently enforceable demand until a claim is denied.… We hold that for purposes of ERISA a cause of action does not accrue until an application is denied.").[13] This case, however, is not limited to the denial of a claim for benefits, but rather is predicated upon an alleged failure or refusal to provide insurance coverage which is mandated by law. Accordingly, the accrual rule premised on claims denial would not appear

applicable. Instead, the appropriate rule would seem to be that plaintiff's cause of action accrued at the time that she, in the exercise of reasonable diligence, discovered or should have discovered her claim. *See Maggio v. Gerard Freezer & Ice Co.*, 824 F.2d 123 (1st Cir.1987) (applying federal accrual rule to securities fraud claim).[14]

■ Plaintiff contends the first knowledge she had concerning her COBRA rights came in late October or early November 1988, while talking about her ordeal with a friend who happened to work with and have substantial familiarity with employee benefit plans.[15] According to Lawrence, that was when she first learned that she had been entitled under COBRA to continuation and conversion coverage, and that she had been misinformed and misled by defendants about her rights. Thus, she maintains that her claims did not accrue until that time and therefore never became the property of the bankruptcy estate. Even accepting as true plaintiff's version of the events as to when she came to learn of her COBRA rights, that

bankruptcy petition in accordance with § 521(1), allegedly because she was unaware of their existence, the claims could not have been abandoned pursuant to § 554(c).

12. In *Patterson v. Shumate*, —— U.S. ——, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992), the Supreme Court held that pension benefits under ERISA could be excluded from the "otherwise broad definition of 'property of the [bankruptcy] estate,'" 112 S.Ct. at 2246, by virtue of section 206(d)(1) of ERISA, an anti-alienation provision which states that "[e]ach pension plan shall provide that benefits provided under the plan may not be assigned or alienated." There being no similar provision preventing alienation of medical benefits, it follows that medical benefits can become property of the bankruptcy estate. Thus, if plaintiff's claim for medical benefits accrued prior to the filing of her bankruptcy petition, then that claim became part of the bankruptcy estate, at least so far as medical expenses occurring before the discharge date are concerned.

13. The court has located no authority to suggest that the usual accrual rules which apply in the statute of limitations context would not similarly apply in establishing the time of accrual for purposes of determining whether the claim became part of a bankruptcy estate. *Cf. Soave v. Wiercioch*, No. 92 C 2886, 1992 WL 247401, LEXIS No. 14481 (E.D.Ill. Sept. 24, 1992) (finding it unnecessary to decide whether determination of date of accrual of cause of action for

statute of limitations purposes is the same as determination of accrual in bankruptcy context).

14. In any event and as is discussed in more detail *infra*, the evidence on the issue of whether plaintiff ever filed any claim for insurance benefits is far from clear. The defendants expressly deny that a claim was ever submitted. And plaintiff seems to suggest that a claim may have been submitted but was never paid or denied. Additionally, evidence has been presented by plaintiff which suggests that she was dissuaded by defendants from filing any claim, and on a number of occasions was actually denied claims forms by defendants who suggested to plaintiff that the filing of a claim would be fruitless, since she was no longer covered under any insurance policy. In short, the record reveals genuine issues of material fact which would preclude summary judgment even if the "claim denial" accrual rule were applicable.

15. According to Lawrence, during the course of a conversation about her difficulties, her friend remarked to Lawrence that she should have taken the continuation coverage offered at the time of her divorce. When Lawrence told the friend that Jackson Mack had refused to give her coverage, the friend then told Lawrence that a federal law required Jackson Mack to provide her continuation coverage. A few months later, Lawrence hired an attorney to pursue the matter and this suit ultimately resulted.

does not settle this issue. That is because actual knowledge of one's cause of action is not a prerequisite to the accrual of her claim. Rather, the claims accrued when she knew or in the exercise of due diligence should have known that she had the claims. On this point, there is a great deal of controversy.

According to plaintiff, in June 1987 she was told in no uncertain terms that her coverage had lapsed and that there was nothing she could do to secure continued coverage, whether under her husband's policy or an individual policy. She made several attempts to obtain coverage through defendants because a number of people, including an attorney, told her she should do so,[16] but her efforts were unavailing as defendants repeatedly informed her that she could not remain covered after her divorce became final. Thus she suggests that despite her diligent efforts, she failed to learn of her rights, in large part due to defendants' having misrepresented to her that she had no rights.

Defendants take the position that even if Lawrence did not discover the legal basis of her claims until late 1988, she nonetheless was aware of the facts giving rise to her claim prior to her filing of a petition in bankruptcy and the claims had accrued regardless of plaintiff's lack of awareness of the legal consequences of defendants' alleged omissions. They further argue that she did not exercise "due diligence" to learn of her claims.

■■■■ The general rule is that a claim accrues when the plaintiff knows or has rea-

son to know of the *facts* which give rise to her claim. Plaintiff here knew the "facts" that she was to be divorced from a Tiny Lawrence, a covered employee, and that defendants had refused to provide her with insurance coverage. However, according to her allegations, she did not know of her legal right to continued coverage in the event of her divorce, nor did she know of the "fact" that defendants had violated their legal duty to advise her of her rights since defendants not only failed to comply with their legal duty to advise her of her rights but went further and explicitly advised her time and time again that she had no rights. That is, either negligently or intentionally, they provided her with not merely misleading but false information regarding her rights, effectively concealing her claims. To permit such alleged conduct by defendants to deprive plaintiff of the opportunity to pursue her claim would, in the circumstance here presented, operate to frustrate the policies underlying COBRA generally and its notice requirements in particular, the very purpose of which is to apprise benefit plan participants of their rights to coverage.[17]

■■■ Further, contrary to defendants' assertions, it could reasonably be concluded from the evidence of record that plaintiff exercised due diligence to discover her rights, but through no fault of her own, was unsuccessful in doing so.[18] While the question whether the plaintiff should have discovered her claim is governed by an objective standard, "the determination of whether a plaintiff actually exercised reasonable dili-

---

**16.** Plaintiff claims that in June 1987, after Jackson Mack's insurance clerk and a Southern Marketing insurance clerk had told her she would not be covered after the divorce, one of her physicians, Dr. Robert Calcote, told her she should still be covered by her husband's insurance. She thus again communicated with Jackson Mack and requested a claim form, but was advised that she was no longer covered by the insurance at issue and her request was denied. According to Lawrence, a subsequent attempt later that month to obtain a claim form likewise proved fruitless. Additionally, plaintiff contends that in June 1987, Dr. William Lotterhos' office attempted to secure a claim form for her and was advised that plaintiff was not covered. When a medical technician in Dr. Lotterhos' office again attempted to secure payment for Lawrence, she

was told by someone at Jackson Mack that the claim would not be paid because, as plaintiff and her husband were divorced, plaintiff was no longer insured.

**17.** That is particularly so where plaintiff charges that defendants' alleged conduct resulted in plaintiff's failure to pay her medical bills which, in turn, resulted in her filing for bankruptcy protection.

**18.** According to plaintiff, she not only inquired of defendants concerning whether she could secure coverage, but she also inquired of her divorce attorney concerning her entitlement to continued coverage and received what that attorney now acknowledges was erroneous advice.

gence requires a more subjective inquiry focusing upon the circumstances of the particular case," including the existence of a fiduciary relationship, the nature of the wrong alleged, the plaintiff's opportunity to discover the wrong, and the subsequent actions of the defendants. *Rodriguez v. Banco Central,* 727 F.Supp. 759 (D.P.R.1989) (citing *Maggio v. Gerard Freezer & Ice Co.,* 824 F.2d 123, 128 (1st Cir.1987). The court is unable to conclude at this juncture that the plaintiff did not exercise due diligence to discover her claims or that based on the information she acquired, she should have known of the existence of her claims. Consequently, the court cannot determine at this time that Lawrence's claims accrued prior to her filing bankruptcy and thus cannot conclude that the claims became the property of the bankruptcy estate.

## GENERAL NOTIFICATION CLAIM

Defendants maintain that even if plaintiff is not precluded from asserting her claims by reason of her having filed for bankruptcy protection and having secured a discharge, she is nevertheless barred from recovery based on the undisputed facts of record. Regarding her claim for defendants' alleged failure to provide her with general COBRA notification, defendants contend that the unrefuted evidence establishes that the general notification mandated by COBRA was, in fact, sent to each employee of Jackson Mack by first class mail and that accordingly, plaintiff's claim premised on the failure to provide such notice must fail. In this regard, Bonny Kelly, Jackson Mack's insurance clerk at the time COBRA became effective, testified by deposition that in October or November of 1986, notice advising of the enactment of COBRA and setting forth the obligations of Jackson Mack, Southern Marketing and employees and beneficiaries with regard to

COBRA benefits and notification requirements was mailed by first class mail to Jackson Mack employees and their families at the latest address on file.[19] Lawrence and her former husband take the position that they never received any notification concerning COBRA.

■ COBRA contains no specific requirements as to the manner in which notice must be given. The courts that have addressed the issue of the manner in which the notices required by § 1166 may be communicated have held that "a good faith attempt to comply with a reasonable interpretation of the statute is sufficient." *Jachim v. KUTV, Inc.,* 783 F.Supp. 1328, 1333 (D.Utah.1992); *Branch v. G. Bernd Co.,* 764 F.Supp. 1527, 1534 n. 11 (M.D.Ga.1991), *aff'd,* 955 F.2d 1574 (11th Cir.1992) ("courts have generally validated methods of notice which are calculated to reach the beneficiary"); *see also* H.R.Rep. No. 453, 99th Cong., 1st Sess. 563 (stating that pending the promulgation of regulations defining what will constitute adequate notice, "employers are required to operate in good faith compliance with a reasonable interpretation" of COBRA's requirements). Methods of notification which are reasonably calculated to reach the employee or beneficiary are considered to conform to the standard of good faith compliance with the statute. *Jachim,* 783 F.Supp. at 1333; *Dehner v. Kansas City Southern Indus., Inc.,* 713 F.Supp. 1397, 1400 (D.Kan.1989) (notices under § 1166 must be reasonably calculated to reach those to whom they were directed; hand delivery deemed sufficient).

In the case at bar, the issue is not whether Jackson Mack's chosen method for notifying employees and beneficiaries of their rights and obligations under COBRA was an adequate method of notification, for it has been recognized that "[a]n employer or plan ad-

---

**19.** Plaintiff makes much of the fact that this notice listed the employer as Truck Center South rather than Jackson Mack. Plaintiff's husband, however, as well as other Jackson Mack employees, testified that referring to the company by the name Truck Center South was done in connection with the company's efforts to expand its business and that employees and their families should have been aware of this designation. Tiny Lawrence testified that by the time the letter

was mailed on November 1, 1986, he would have had no "doubt or question about what Truck Center South referred to," and that plaintiff "should have" also known the meaning of the term "Truck Center South." In any event, since Pamela Lawrence denies ever having seen the notice, she was certainly not confused by the designation of her husband's employer as Truck Center South rather than Jackson Mack.

ministrator who sends proper notice by first class mail to the covered employee's last known address is deemed to be in good faith compliance" with the notice requirements of § 1166. *Truesdale v. Pacific Holding Co./ Hay Adams Div.,* 778 F.Supp. 77, 81 (D.D.C. 1991); *see also Jachim,* 783 F.Supp. at 1333; *Dehner,* 713 F.Supp. at 1400. The question here concerns the adequacy of Jackson Mack's proof that such notices were in fact mailed.

In *Truesdale,* the court observed that "correspondence which is addressed and mailed properly, is presumed to have been received," *Truesdale,* 778 F.Supp. at 81 (citing *Legille v. Dann,* 544 F.2d 1 (D.C.Cir.1985), and where this presumption of receipt arises, the plaintiff's claim that she never received the correspondence will not be sufficient to rebut it. The plaintiff in *Truesdale* claimed that she had rebutted the presumption of receipt by her testimony of non-receipt coupled with the fact that the defendant had failed to include her complete address on the notices. The court, though, rejected her claim because the defendant, in addressing the notices to plaintiff's "last known address," had utilized the precise address which the plaintiff had provided on her employment application and on an employee data card which she filled out after she was hired. Thus, the court deemed that the employer's good faith reliance on information provided by the plaintiff was sufficient, and concluded that the plaintiff was not entitled to benefit from her own error. 778 F.Supp. at 81.

In *Jachim,* the employer presented proof, in the form of the affidavit of its manager of human resources, that she prepared a letter to the plaintiff advising him of his termination from employment and of his COBRA right to continue medical coverage. The affidavit stated that in accordance with the company's standard office procedure, she had addressed the letter to the employee's last known address (which address was apparently recited in the affidavit), and placed the letter into the company's mail bin, from which letters were regularly retrieved and delivered to the United States Post Office by KUTV employees. The employee, however, denied that he ever received the notices.

Unlike the court in *Truesdale,* the *Jachim* court was unconcerned with the question whether any presumption of receipt arose, since in that court's view, the issue was not whether the employee had received the notice, but rather was whether the employer caused the notice to be sent in a good faith manner reasonably calculated to reach the employee. 783 F.Supp. at 1333–34. The court found that the affidavit described tended to show that the company did cause the notice to be mailed. And it found an absence of any evidence from the plaintiff to indicate that notice was not mailed, stating:

> Jachim, on the other hand, does not offer any evidence challenging Cobbledick's testimony that she prepared the letter and mailed it in accordance with KUTV's standard procedures. Nor does Jachim offer any evidence that the letter was not retrieved from KUTV's mail bin and delivered to the United States Postal Service.

*Id.* at 1334. Thus, the court concluded that, as a matter of law, the company had satisfied its obligations under § 1166.

This court shares the view of the *Jachim* court that § 1166 does not require proof that the notices required by that section be received. The court thus limits its consideration of the proof solely to the question of whether there is a genuine issue of material fact concerning Jackson Mack's assertion that the notice was mailed. In contrast to the proof presented in *Jachim* and *Truesdale,* Bonny Kelly's testimony concerning the circumstances of the alleged mailing of COBRA notices to employees and their families in the case at bar is not sufficient, standing alone, to demonstrate that the notices were "addressed and mailed *properly.*" *Truesdale,* 778 F.Supp. at 81. Kelly testified only that "[w]e mailed [the notice] first class mail to the employee home address; that was the latest home address they had on file, we sent to that address." She could not recall how the notices were addressed and did not relate the address of the Lawrences to which she claimed to have mailed the notice. Further, she offered no information concerning the company's standard mailing procedures or the procedures which were utilized in the

case of these particular notices.[20] Based on the current state of the record, the court is compelled to conclude that there exists a genuine issue as to whether the notices were mailed, thus making summary judgment inappropriate.[21]

## QUALIFYING EVENT NOTIFICATION CLAIM

 COBRA requires that in the event of a divorce, the benefit plan participant is responsible for notifying the employer of the occurrence of that qualifying event; only in the event this notification is given does the employer have an obligation to provide notification to that participant of her rights to continuation or conversion coverage. 29 U.S.C. § 1166(a)(4)(B). In the instant case, Lawrence claims that prior to her divorce, she repeatedly advised defendants that a divorce was imminent and that she wished to continue her coverage, and she further maintains that immediately following her divorce, she continued to communicate with defendants with specific reference to the effect of her recent divorce on her insurance coverage. Additionally, Lawrence contends that many employees of Jackson Mack, including Bonny Kelly, the insurance clerk, were generally aware of the fact that she and Tiny were separated and would be divorced.[22]

Plaintiff claims that despite her having made defendants well aware of the fact of this "qualifying event," defendants nevertheless failed to provide her with the qualifying event notification required by COBRA.

 Defendants dispute that plaintiff provided them with *any* notice of her divorce, but contend that even if she did provide oral notification, as she claims, that notice would not be sufficient to trigger the requirements of § 1166. That is, defendants argue that the notice of a qualifying event must be in writing to be effective. In support of their position, defendants cite Treasury Department Regulations § 1.162.26, 26 C.F.R. pt. 1, which provide that if notice is not "sent" within sixty days of the occurrence of a qualifying event or the date that coverage would lapse due to the qualifying event, qualifying event notification need not be given. This argument was rejected in *Swint v. Protective Life Ins. Co.*, 779 F.Supp. 532 (S.D.Ala.1991) ("That notification, *which, significantly, is not required to be in or to assume any particular form,* then triggers notification obligations on the part of the plan administrator.") (emphasis in original), because, as the court noted:

> Although the regulation uses the word "sent" in reference to the qualified benefi-

20. In an effort to establish that Jackson Mack's efforts at notification were inadequate, plaintiff has presented the affidavit of a purported COBRA expert who states that the notice to Truck Center South employees, *see supra* note 19, did not reasonably provide notice to employees of Jackson Mack and their families of the right to continuation coverage. Additionally, this expert opines that only *documentation* of Jackson Mack's alleged mailing of notices would constitute good faith compliance with the statutory mandate of section 1166(a)(1). Plaintiff's professed expert's contention as to what might be deemed the ideal method of giving notice is not of assistance "in determining a fact in issue," Fed.R.Evid. 702, since the issue is simply whether the notice that was given was reasonably calculated to reach its recipient. Further, the expert's opinion as to what might constitute appropriate documentation of efforts to give notice is certainly not relevant, for issues regarding the sufficiency of proof are not properly the subject of expert testimony. The testimony, therefore, has not been considered for purposes of the motions presently under consideration and will not be permitted at trial.

21. It does not follow from the fact that plaintiff's non-receipt of the notice is not the standard for liability under § 1166 that the testimony of Lawrence and her ex-husband that they did not receive any notice about COBRA from Jackson Mack is not relevant. Given the state of the evidence as it presently exists, it could be considered probative on the mailing issue.

22. It is undisputed that in April, prior to the divorce, Tiny Lawrence changed the beneficiary of his life insurance and changed his tax withholding status from married to single. Plaintiff asserts that these actions should have put Jackson Mack on notice that a qualifying event was about to occur. Bonny Kelly claims that she knew the Lawrences were separated, but states that employees often changed beneficiaries and withholding status regardless of their marital status. Even if Mr. Lawrence's activity should have put Kelly on "inquiry notice," that would not suffice as a basis for concluding that Lawrence had given notice to Jackson Mack of a qualifying event. Lawrence's testimony, however, is that she did in fact provide notice to Jackson Mack, so she is not relegated to relying on circumstantial proof of notice.

ciary's notice of election, thus implying that the notice must be in writing, the regulation does *not* require or so imply that the notice to the employer or plan administrator of the occurrence of a qualifying event must be in writing.

*Id.* at 554 n. 56. The court concludes that Lawrence was not required to provide written notification of her divorce; and if, as she contends, she did give defendants oral notice of that qualifying event, then defendants' duty to in turn give Lawrence notice of her rights to continued coverage upon that divorce was breached. Clearly, there exist genuine issues of material fact as to this claim which preclude entry of summary judgment.[23]

## BREACH OF FIDUCIARY DUTIES

In her amended complaint, plaintiff alleges that defendants breached their fiduciary duties by failing to comply with statutory notice requirements and for this alleged omission, she seeks actual damages pursuant to 29 U.S.C. §§ 1109 and 1132(a)(2).[24] Defendants maintain that Lawrence's breach of fiduciary duties claim must be dismissed since she, as an individual plan beneficiary, is not authorized by ERISA to pursue a claim for money damages under either § 1109 of § 1132(a)(2) for alleged breaches of fiduciary duties.

It is clear that § 1109, one of the ERISA provisions under which plaintiff seeks to recover damages for defendants' alleged breaches of fiduciary duties, cannot be utilized as a basis for recovery. That section provides in relevant part as follows:

(a) Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary. . . .

In *Massachusetts Mutual Life Insurance Co. v. Russell,* 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985), the Supreme Court addressed the question "whether, under [ERISA], a fiduciary to an employee benefit plan may be held personally liable to a plan participant or beneficiary for extracontractual compensatory or punitive damages caused by improper or untimely processing of benefit claims." After first noting the section's apparent "emphasis on the relationship between the fiduciary and the plan as an entity," *id.* at 140, 105 S.Ct. at 3089, the Court was persuaded by the text of § 1109 that "Congress did not intend that section to au-

---

**23.** Another basis upon which defendants seek dismissal of plaintiff's qualifying event notification claim is their contention that the claim is barred by the one-year statute of limitations provided by Miss.Code Ann. § 15–1–33. While the court entertains serious doubts about the applicability of a one-year limitations period to the claim, the court need not reach that issue since, as discussed *supra,* if plaintiff's claim accrued in 1987, as defendants contend, she would be precluded from asserting it due to the fact of the bankruptcy discharge, and if it accrued in 1988, as plaintiff maintains, it would not be included in the bankruptcy estate and would have been timely filed under the one-year statute of limitations which defendants claim applies.

**24.** Plaintiff alleges that defendants breached 29 U.S.C. §§ 1104 and 1105. Section 1104 provides in pertinent part:
(1) Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries . . .
. . . .
(B) with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. . . .
Section 1105 prescribes the circumstances in which "a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan." These include circumstances in which the fiduciary (1) knowingly participated in the breach by another fiduciary, (2) by its fiduciary omissions enabled such other fiduciary to commit the breach, or (3) has knowledge of the breach of the other fiduciary yet fails to make reasonable efforts to remedy the breach.

thorize any relief except for the plan itself," *id.* at 144, 105 S.Ct. at 3091.

> [T]he structure of the entire statute, and its legislative history all support the conclusion that in [§ 1109(a)] Congress did not provide, and did not intend the judiciary to imply, a cause of action for extracontractual damages caused by improper or untimely processing of benefit claims.

*Id.* at 148, 105 S.Ct. at 3093; *see also Corcoran v. United Healthcare, Inc.*, 965 F.2d 1321 (5th Cir.1992) (*Russell* held that § 1109 "authorized only actions on behalf of the plan as a whole, not individual beneficiaries, for losses to the plan").

While *Russell* is dispositive of plaintiff's claim for damages under § 1109, it does not similarly resolve her claim for damages under § 1132(a)(3). Indeed, because the plaintiff in *Russell* relied entirely on § 1109 as the basis for her entitlement to recovery and expressly disclaimed reliance on § 1132(a)(3), the Court deliberately left open the question whether "any other provision of ERISA authorizes recovery of extracontractual damages." *Id.* 473 U.S. at 139 n. 5, 105 S.Ct. at 3088 n. 5.

▮ The Fifth Circuit explained in *Corcoran v. United Healthcare, Inc.*, 965 F.2d 1321 (5th Cir.1992), that "[w]hen a beneficiary simply wants what was supposed to have been distributed under the plan, the appropriate remedy is § 502(a)(1)(B)...." *Cor-*

*coran*, 965 F.2d at 1335. Thus, to the extent that plaintiff seeks to recover the benefits and coverage which she would have received had defendants complied with their statutory duties, § 1132(a)(1)(B) provides a basis for her recovery.[25] *See Larsen v. NMU Pension Plan Trust*, 767 F.Supp. 554 (S.D.N.Y.1991) (finding breach of fiduciary duty by reason of fiduciary's failing to provide statutorily required information concerning pension and providing materially misleading information to employee as to availability of pension and awarding damages to plan beneficiary for such breaches.) "Damages that would give a beneficiary more than he or she is entitled to receive under the strict terms of the plan are typically termed 'extracontractual.' Section 502(a)(3) by its terms permits beneficiaries to obtain 'other appropriate equitable relief' to redress (1) a violation of the substantive provisions of ERISA or (2) a violation of the terms of the plan." *Id.* The question is whether additional damages, "extracontractual damages," are available for the alleged breaches. In this regard, plaintiff seeks to recover "incidental and consequential damages" for defendants' alleged violations of ERISA, including their alleged breaches of fiduciary duties. More specifically, she seeks to recover damages for her loss of credit status, loss of financial stability, embarrassment, humiliation and menace, severe mental and emotional distress and anxiety, and loss of enjoyment of life.[26]

---

**25.** Section 1132 provides that

> [a] civil action may be brought—
> **(1)** by a participant or beneficiary—
> **(A)** for the relief provided in subsection (c) of this section, or
> **(B)** to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;
> ....
> **(3)** by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan....

**26.** Citing *Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 135, 145, 111 S.Ct. 478, 481, 486, 112 L.Ed.2d 474 (1990), plaintiff argues that the Supreme Court has approved claims for compensatory and punitive damages in ERISA actions.

While one court has read *Ingersoll* as giving the "green light" to claims for compensatory and punitive damages, as well as jury trials, *see Blue Cross & Blue Shield v. Lewis*, 753 F.Supp. 345, 347 (N.D.Ala.1990), this court does not construe that decision so broadly. A review of the *Ingersoll* opinion reveals that the Court there was concerned only with the preemption issue and held that the plaintiff could not avoid preemption simply by asserting that he was not claiming entitlement to "pension benefits." *Ingersoll*, 498 U.S. at 145, 111 S.Ct. at 486. The Court merely noted that plaintiff's putative claim was in the nature of a state law claim for which she sought to recover compensatory and punitive damages under tort and contract theories. It is clear that, contrary to plaintiff's suggestion, punitive damages are not equitable in nature and are therefore not available under § 1132(a)(3)(B). *See, e.g., Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 54, 107 S.Ct. 1549, 1556, 95 L.Ed.2d 39 (1987); *Sommers Drug Stores v. Corrigan Enters., Inc.*, 793 F.2d 1456 (5th Cir.1986) (punitive damages

In *Pilot Life Ins. Co. v. Dedeuax,* 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987), the Supreme Court held that 29 U.S.C. § 1132 provides the exclusive remedies for violations of ERISA. Although the statute provides at subsection (3)(B) that an action may be brought "to obtain other appropriate equitable relief," the question of what constitutes "other appropriate equitable relief" has been the subject of much discussion and disagreement among the courts. The courts have uniformly held that the section does not permit an award of punitive damages. *See, e.g., Sommers Drug Stores v. Corrigan Enterprises,* 793 F.2d 1456 (5th Cir.1986), *cert. denied,* 479 U.S. 1089, 107 S.Ct. 1298, 94 L.Ed.2d 154 (1987). Some courts have concluded that the relief referenced by § 1132(a)(3) is limited to declaratory or injunctive relief and does not include damages of any kind. *Drinkwater v. Metropolitan Life Ins. Co.,* 846 F.2d 821, 824 (1st Cir.), *cert. denied,* 488 U.S. 909, 109 S.Ct. 261, 102 L.Ed.2d 249 (1988); *Sokol v. Bernstein,* 803 F.2d 532, 538 (9th Cir.1986). Some have found that such consequential injuries as emotional distress are not available as "appropriate equitable relief." *See United Steelworkers of America v. Connors Steel Co.,* 855 F.2d 1499 (11th Cir.1988), *cert. denied sub nom, H.K. Porter Co. v. United Steelworkers of America,* 489 U.S. 1096, 109 S.Ct. 1568, 103 L.Ed.2d 935 (1989); *Powell v. Chesapeake & Potomac Tele. Co.,* 780 F.2d 419 (4th Cir.1985), *cert. denied,* 476 U.S. 1170, 106 S.Ct. 2892, 90 L.Ed.2d 980 (1986). And others have suggested that such extracontractual damages as are necessary to restore the plaintiff to the condition she occupied prior to the alleged breach may be recoverable. *See Warren v. Society Nat'l Bank,* 905 F.2d 975 (6th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2256, 114 L.Ed.2d 709 (1991).

The Fifth Circuit considered whether punitive damages were available under either § 1109 or § 1132(a)(3) for breach of fiduciary duties in *Sommers Drug Stores v. Corrigan Enterprises, Inc.,* 793 F.2d 1456 (5th Cir.

1986), *reh'g denied en banc,* 797 F.2d 977 (5th Cir.1986). Initially, the court addressed the question whether the phrase in § 1109 "other equitable or remedial relief" included punitive damages, and concluded that it did not, because:

> "Equitable or remedial" relief generally includes all of the kinds of relief available to restore the plaintiff's losses or protect him from future harm—recission, *e.g., Gilliam v. Edwards,* 492 F.Supp. 1255, 1267 (D.N.J.1980), removal of the trustee, *e.g., Katsaros v. Cody,* 744 F.2d 270, 281 (2d Cir.), *cert. denied,* 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984), appointment of a receiver, *e.g., Marshall v. Snyder,* 572 F.2d 894, 901 (2d Cir.1978), and other similar relief. Punitive damages do not fall within the broad category of "equitable or remedial" relief; rather than restoring the plaintiff's losses and protecting him from future harm, punitive damages are designed to punish the wrongdoer and deter others from similar misconduct.

*Id.* at 1463. The court then concluded that punitive damages were similarly unavailable under § 1132(a)(3)(B), explaining:

> The Supreme Court left open in *Russell* the issue whether this provision permits recovery of extracontractual compensatory or punitive damages. *See* 105 S.Ct. at 3089 n. 5. For the reasons discussed at length in the preceding subsection, we conclude that it does not. In brief, the phrase "equitable relief," as it is used in the law of trusts, does not encompass punitive damages.

*Id.* at 1464. Though the court in the last quoted passage from *Sommers Drug* made a reference to "extracontractual compensatory or punitive damages," the court's opinion actually discussed only whether punitive damages could be awarded for a breach of fiduciary duty under ERISA. No issue was raised concerning extracontractual damages and other than the one reference described, the court did not purport to address or re-

not available under ERISA); *Goodman v. S & A Restaurant Corp.,* 756 F.Supp. 966, 971 (S.D.Miss.1990) (punitive damages not recoverable under ERISA); *Moffitt v. Blue Cross & Blue Shield, Inc.,* 722 F.Supp. 1391, 1394 (N.D.Miss. 1989) (§ 1132(A)(3) provides for equitable relief only).

solve any question concerning extracontractual damages under ERISA.

More recently, the Fifth Circuit was called upon to address the relief available under ERISA for breaches of fiduciary duties. In *Corcoran v. United Healthcare, Inc.*, 965 F.2d 1321 (5th Cir.1992), the court stated, "[t]he question whether extracontractual or punitive damages are available to a beneficiary under § 502(a)(3) has been left open by the Supreme Court ever since [*Russell*]." *Id.* at 1335.[27] The court in *Corcoran* was confronted, as is this court, with a contention by the plaintiff that an analysis suggested by Justice Brennan in his concurrence in *Russell* which would permit the recovery of certain types of extracontractual damages should be adopted by the court. The court explained Justice Brennan's concurrence as follows:

> In a concurrence joined by three other justices, Justice Brennan emphasized that he read the Court's reasoning to apply only to § 409(a), and that the legislative history of ERISA suggested that courts should develop a federal common law in fashioning "other appropriate equitable relief" under § 502(a)(3). *Id.* at 155–56, 105 S.Ct. at 3097. (Brennan, J., concurring in the judgment). Justice Brennan argued that Congress "intended to engraft trust-law principles onto the enforcement scheme" of ERISA, including the principle that courts should give to beneficiaries of a trust the remedies necessary for the protection of their interests. *Id.* at 156–57. 105 S.Ct. at 3097–98. Consequently, he encouraged courts faced with claims for extracontractual damages first to determine to what extent state and federal trust and pension law provide for the recovery of damages beyond any benefits that have been withheld, and second to consider whether extracontractual relief would conflict with ERISA in any way. *Id.* at 157–58, 105 S.Ct. at 3098. With respect to the first inquiry, he indicated that any deficiency in trust law in the availability of make-whole remedies should not deter courts from authorizing such remedies un-

der § 502(a)(3), for Congress intended in ERISA to strengthen the requirements of the common law of trusts as they relate to employee benefit plans. *Id.* at 157 n. 17, 105 S.Ct. at 3098 n. 17. Finally, Justice Brennan suggested, courts should keep in mind that the purpose of ERISA is the "enforcement of strict fiduciary standards of care in the administration of all aspects of pension plans and promotion of the best interests of participants and beneficiaries." *Id.* at 158, 105 S.Ct. at 3098.

965 F.2d at 1335–36. The Fifth Circuit ultimately found it unnecessary to determine whether "Justice Brennan's view of 'other appropriate equitable relief' as potentially encompassing make-whole relief" was a proper construction of § 1132(a)(3)(B), since the form of extracontractual damages sought by the plaintiffs, emotional distress damages, would have been unavailable even under such a construction. However, the court expressed implicit approval of Justice Brennan's view, stating:

> The characterization of equitable relief as encompassing damages necessary to make the plaintiff whole may well be consistent with the trust law principles that were incorporated into ERISA and which guide its interpretation. *See Firestone, [Tire & Rubber Co. v. Bruch]*, 489 U.S. [101] at 110–11, 109 S.Ct. [948] at 953–54 [103 L.Ed.2d 80 (1989)] (because ERISA is largely based on trust law, those principles guide interpretation); H.R.Rep. No. 533, 93d Cong., 1st Sess. (1973), *reprinted in* 1974 U.S.Code Cong. & Admin.News 4639; S.Rep. No. 127, 93d Cong. 1st Sess., *reprinted in* 1974 U.S.Code Cong. & Admin.News 4838 (indicating intent to incorporate the law of trusts into ERISA). Section 205 of the Restatement (Second) of Trusts allows for monetary damages as make-whole relief, providing that a beneficiary has "the option of pursuing a remedy which will put him in the position in which he was before the trustee committed the breach of trust" or "of pursuing a remedy which will put him in the position in which

**27.** The court in *Corcoran* discussed its previous opinion in *Sommers* at length in connection with a preemption issue which was presented. Inex-

plicably, however, the *Corcoran* court omitted any reference to *Sommers* in its discussion of the damages issue.

he would have been if the trustee had not committed the breach of trust." In the context of breach of a trustee's investment duties, "the general rule [is] that the object of damages is to make the injured party whole, that is, to put him in the same condition in which he would have been if the wrong had not been committed.... Both direct and consequential damages may be awarded." G. Bogert & G. Bogert, *The Law of Trusts and Trustees*, § 701, at 198 (2d ed. 1982); *see also Estate of Talbot*, 141 Cal.App.2d 309, 296 P.2d 848 (1956); *In re Cook's Will*, 136 N.J.Eq. 123, 40 A.2d 805 (1945).

This view may also be consistent with the common law contract doctrine which assists us in interpreting ERISA. As the Court observed in *Russell*, ERISA was enacted "to protect contractually defined benefits." 473 U.S. at 148, 105 S.Ct. at 3093. Prior to the enactment of ERISA, the rights and obligations of pension beneficiaries and trustees were governed not only by trust principles, but in large part by contract law. *Firestone*, 489 U.S. at 112–13, 109 S.Ct. at 955; *see also Hoefel v. Atlas Tack Corp.*, 581 F.2d 1, 4–7 (1st Cir.1978); *Audio Fidelity Corp. v. Pension Benefit Guaranty Corp.*, 624 F.2d 513, 517 (4th Cir.1980); *Rochester Corp. v. Rochester*, 450 F.2d 118, 120–21 (4th Cir.1971). It is well established that contract law enables an aggrieved party to recover such damages as would place him in the position he would have occupied had the contract been performed, Restatement (Second) of Contracts § 347 comment a (1981), including those damages that could reasonably have been foreseen to flow from the breach. *Id.* § 351; *see Warren v. Society Nat'l Bank*, 905 F.2d 975, 980 (6th Cir. 1990) (§ 502(a)(3) allows for recovery of beneficiaries' increased tax liability after plan administrators failed to follow instructions regarding distribution), *cert. denied*, —— U.S. ——, 111 S.Ct. 2256, 114 L.Ed.2d 709 (1991).

*Id.* at 1336–37.

Given what could be construed as the Fifth Circuit's implicit approval of Justice Brennan's approach, this court cannot conclude that ERISA precludes the recovery of all extracontractual damages. Rather, it appears that it is incumbent on the court to analyze the types of extracontractual damages sought to be recovered by Lawrence for the purpose of determining whether any part of those damages would be available under the law of trusts to place her in the position she occupied prior to defendants' alleged breaches. In this regard, the *Corcoran* court held that damages for mental and emotional distress and anguish would not be recoverable under ERISA. Therefore, plaintiff's claim for "severe mental and emotional distress," for "embarrassment, menace and humiliation," and for "loss of enjoyment of life" are not recoverable in this action and defendants are entitled to summary judgment on her claims for such damages.

 The remaining extracontractual damages sought by plaintiff consist of damages for "loss of credit status" and "loss of financial stability" resulting from her having been forced to file for bankruptcy protection which, she alleges, was caused by defendants' alleged omissions. A number of courts have recognized that an award for damage to one's credit resulting from a breach of contract may be necessary to place that party in the position he occupied before the breach, but only if the loss of credit results in pecuniary loss, the amount of which is reasonably ascertainable. *See, e.g., National Farmers Organization, Inc. v. Kinsley Bank*, 731 F.2d 1464, 1472 (10th Cir.1984); *In re Jackson*, 92 B.R. 987, 995 (Bankr.E.D.Pa.1988). In the case at bar, plaintiff has not alleged, nor has she even suggested that the damage to her credit standing caused any pecuniary loss. Therefore, defendants are entitled to summary judgment on her claim for these damages. Consequently, should plaintiff prevail on her claims relative to defendants' alleged violations of ERISA, including the alleged violations of their fiduciary duties, plaintiff's recovery will be limited to the medical benefits and coverage which should have been made available to her by defendants under COBRA.

## TORTIOUS INTERFERENCE

 In addition to her claims under ERISA, plaintiff contends that Jackson Mack tortiously interfered with her contractual and statutory rights in regard to her obtaining

continuation or conversion coverage with Northbrook and to her obtaining prospective benefits under the employee benefit plan of Jackson Mack. The court is of the opinion that ERISA preempts plaintiff's claim of tortious interference. ERISA preempts all state laws which "relate to any employee benefit plan" except those "which regulate insurance, banking, or securities," *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987),[28] or which "affect employee benefit plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law 'relates to' the plan," *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 100 n. 21, 103 S.Ct. 2890, 2901 n. 21, 77 L.Ed.2d 490 (1983). Plaintiff's claim of tortious interference arises under state law and relates directly to the ERISA plan at issue. The claim is, therefore, preempted by ERISA.[29] Accordingly, defendants' motions for summary judgment will be granted as to plaintiff's claim for tortious interference.[30]

## POTENTIAL LIABILITY OF NORTHBROOK AND SOUTHERN MARKETING

As an additional basis for summary judgment, Northbrook and Southern Marketing argue that plaintiff cannot recover against them because Jackson Mack was solely responsible for providing Lawrence with notification of her rights to continuation coverage upon her divorce. Section 1166(a)(4) places the responsibility for sending qualifying event notification on the plan administrator. And where no plan administrator is named, the plan sponsor becomes the administrator. *Thonen v. McNeil–Akron, Inc.,* 661 F.Supp. 1252 (N.D.Ohio 1986) (plan sponsor is an administrator if administrator is not designated); *Pension Benefit Guar. Corp. v. Greene,* 570 F.Supp. 1483 (W.D.Pa.1983), *aff'd,* 727 F.2d 1100 (3d Cir.), *cert. denied,* 469 U.S. 820, 105 S.Ct. 92, 83 L.Ed.2d 38 (1984) (defendant other than plan sponsor not liable for failure to provide information where plan did not name administrator and therefore plan sponsor was plan administrator). However, the Fifth Circuit suggested in *Fisher v. Metropolitan Life Ins. Co.,* 895 F.2d 1073, 1077 (5th Cir.1990), that the plan administrator named in the plan documents may delegate its responsibilities, and where it does so, the administrator's delegee can thereby become a *de facto* administrator and incur liability for its omis-

---

**28.** *See also Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990) (state law wrongful discharge claim preempted by ERISA); *Brock v. Primedica, Inc.,* 904 F.2d 295, 297 (5th Cir.1990) (state law claims against an insurer and plan administrator for mental anguish, emotional distress and financial hardship preempted by ERISA); *Lee v. E.I. DuPont de Nemours and Co.,* 894 F.2d 755, 757 (5th Cir. 1990) (state law claims against employer for misrepresentation and fraud preempted by ERISA); *Degan v. Ford Motor Co.,* 869 F.2d 889, 893–95 (5th Cir.1989) (ERISA preemption of state law claims); *Goodman v. S & A Restaurant Corp.,* 756 F.Supp. 966, 967–71 (S.D.Miss.1990) (state law claim for negligent handling of enrollment form preempted by ERISA); 29 U.S.C. §§ 1144(a) and 1144(b)(2)(A).

**29.** Plaintiff concedes in her response to defendants' motions that "state law claims are certainly preempted."

**30.** Lawrence asserts that in the event her state law claim is dismissed, she should be granted leave to file an amended complaint containing a claim pursuant to 29 U.S.C. § 1140. Section 1140 makes it

unlawful for any person to discharge, fire, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, this subchapter ..., or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, this subchapter....

The primary purpose for Congress' enactment of this section was to prevent unscrupulous employers from discharging or in any manner harassing their employees in order to prevent them from obtaining vested pension rights; that is, it was intended to protect the employment relationship. *West v. Butler,* 621 F.2d 240 (6th Cir.1980); *see also Fuchs v. Lifetime Doors, Inc.,* 939 F.2d 1275 (5th Cir.1991) (§ 1140 "yields a claim not for wrongfully withheld benefits ... but for wrongful 'discharge' "); *Deeming v. American Standard, Inc.,* 905 F.2d 1124 (7th Cir.1990) (fundamental prerequisite to action under § 1140 is allegation that employer-employee relationship was changed in some discriminatory or wrongful way). As there is no suggestion that any employment relationship was affected by defendants' alleged failure to notify Lawrence of her right to continuation coverage, her request to amend her complaint to include a § 1140 claim will be denied on the basis of futility.

sions. *Id.* at 1077 ("argument that Metropolitan should be regarded as a *de facto* plan administrator has intuitive appeal."). There are indications of such a delegation in the case at bar. Most suggestive of such a delegation is the fact that the general COBRA notification letter prepared by Jackson Mack for distribution to employees identified Southern Marketing as the plan administrator. Jackson Mack and Southern Marketing each point to the other as the plan administrator. And Jackson Mack maintains that it acted in reliance on the representations and instructions of Northbrook, which was also responsible for the preparation of all plan forms. As there are these indications in the record that Northbrook and/or Southern Marketing may have acted as plan administrators at times, assuming or offering to assume some of the administrator's duties, the court will deny their motion for summary judgment as to plaintiff's qualifying event notification claim.

Neither are these defendants entitled to summary judgment on Lawrence's claim for the alleged breach of the duty to provide general COBRA notification. The Fifth Circuit in *Kidder v. H & B Marine, Inc.*, 932 F.2d 347, 356 (5th Cir.1991), expressly adopted an interpretation of 29 U.S.C. § 1166(a)(1)'s reference to "the group health plan" which places the general notification duty on all individual parties to the group plan.

## MOTION FOR SUMMARY JUDGMENT ON JACKSON MACK'S CROSS CLAIM

█ Jackson Mack contends by its cross-claim that since all of its actions in connection with the ERISA plan at issue were taken at Northbrook's direction, then it is entitled to indemnification from Northbrook if Jackson Mack is found to be liable to Lawrence. More specifically, Jackson Mack argues that in performing its obligations in relation to the plan, it relied exclusively upon the information contained in the "administrative kit" sent to it by Northbrook to Jackson Mack. The court has considered North-

brook's and Southern Marketing's motion for summary judgment as to the cross-claim of Jackson Mack and concludes that it is well taken and should be granted as the court is of the opinion that Jackson Mack may not seek indemnity or contribution for its alleged failure to provide qualifying event notification.

In *Whitfield v. Lindemann*, 853 F.2d 1298 (5th Cir.1988), the Fifth Circuit addressed the issue of indemnification as between a trustee and a nonfiduciary participant:

> In his role as trustee, Lindemann, a sophisticated businessman, owed the primary responsibility to the Plan. To say that he was derelict in the performance of his duties is to put it mildly. The benefits which ERISA was intended to achieve, and equitable principles as well, would be ill-served if trustees such as Lindemann could avoid all liability for their derelictions by transferring such liability to the shoulders of others who, at best, could only have participated in the trustees' wrongdoing. We conclude that the district court erred in ordering such indemnification in the instant case.

*Id.* at 1303 (citations omitted); *cf. Kim v. Fujikawa*, 871 F.2d 1427 (9th Cir.1989) (contribution is unavailable to ERISA fiduciaries who breach their ERISA duties). This reasoning is applicable in the present context as well. As the court held *supra*, Northbrook and Southern Marketing may be jointly liable with Jackson Mack under the facts of this case; but Jackson Mack is not entitled to indemnity. *See Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 135, 105 S.Ct. 3085, 3086, 87 L.Ed.2d 96 (1984) ("The federal judiciary will not engraft a remedy on a statute, no matter how salutary, that Congress did not intend to provide.").[31] Accordingly, the motion of Northbrook and Southern Marketing for summary judgment as to Jackson Mack's cross-claim is granted.

## JURY TRIAL

█ Plaintiff seeks a jury trial on her ERISA claims. In the court's opinion, she is not entitled to a jury trial under ERISA.

---

31. The court would note that documents sent to Jackson Mack by Northbrook following the enactment of COBRA specifically state that notification is the employer's responsibility.

See *Calamia v. Spivey,* 632 F.2d 1235 (5th Cir. Unit A 1980) (ERISA does not entitle plaintiff to a jury trial); *Daniel v. Eaton Corp.,* 839 F.2d 263, 268 (6th Cir.1988) (same); *Wardle v. Central States, Southeast and Southwest Areas Pension Fund,* 627 F.2d 820, 829–830 (7th Cir.1980). The Court therefore grants defendants' requests to strike plaintiff's demand for a jury trial.

## ATTORNEY'S FEES

■ Plaintiff seeks to recover attorneys' fees pursuant to 29 U.S.C. § 1132(g). Defendants contend that she is not entitled to attorney's fees as the record reveals no evidence of bad faith. *See Kidder,* 932 F.2d at 357 (affirming denial of attorney's fees in absence of evidence of bad faith). In the instant case, though, it is alleged that defendants affirmatively misled plaintiff as to both her insured status and her COBRA rights. Accordingly, defendants' motions are in this respect denied.

## CONCLUSION

In summary, Jackson Mack's motion for partial summary judgment and Northbrook's and Southern Marketing's summary judgment motion are granted as they pertain to plaintiff's claim for tortious interference and her demand for the recovery of damages for mental and emotional distress, humiliation, menace, and loss of credit standing and financial stability. Further, defendants' request to strike plaintiff's demand for a jury trial is granted. The remainder of defendants' motions for summary judgment as to plaintiff's claims are denied. Finally, defendants Northbrook's and Southern Marketing's motion for summary judgment as to Jackson Mack's cross-claim is granted.[32]

---

**32.** Plaintiff initially demanded a detailed accounting as to which all defendants sought summary judgment. Plaintiff has at this point apparently abandoned this request and conceded that summary judgment is appropriate thereto since no mention of an accounting was made in response to the motions for summary judgment. In any event, the court concludes that Lawrence is *not* entitled to *any such accounting.*