**Christopher M. FEIST, Plaintiff,**

v.

**CONSOLIDATED FREIGHTWAYS CORPORATION t/a CF Motor Freight, Defendant.**

**Civil Action No. 97–4719.**

United States District Court,
E.D. Pennsylvania.

March 31, 1999.

---

**4.** See n. 2, *supra.*

274

Russell D. Henkin, Berger & Montague, P.C., Philadelphia, PA, Neil E. Jokelson, Neil E. Jokelson & Assoc., P.C., Philadelphia, PA, Andrew N. Schwartz, Weinfeld, P.C., Philadelphia, PA, Derek Jokelson, Jokelson and Assoc., Philadelphia, PA, for plaintiff.

Mary Kay Brown, David B. Fawcett, III, Susan M. Guerette, Buchanan Ingersoll Professional Corp., Philadelphia, PA, for defendant.

Timothy R. Coyne, Stradley, Ronon, Stevens & Young, LLP, Philadelphia, PA, for movant.

## *MEMORANDUM*

ROBERT F. KELLY, District Judge.

This is an action for personal injuries alleged to have been sustained by the Plaintiff. It was proceeding to trial in the ordinary course when Defendant, Consolidated Freightways, discovered that Plaintiff brought this action, in his own name, after having filed a petition in bankruptcy. The Defendant has filed a Motion to Dismiss contending that the Plaintiff is not the real party in interest. Plaintiff has filed a Motion to Substitute the Real Party in Interest, The Trustee in Bankruptcy.

## A. THE EFFECT OF PLAINTIFF'S BANKRUPTCY.

The filing of a bankruptcy petition creates an estate that generally includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Any causes of action that accrue to the debtor prior to the filing of the bankruptcy petition are property interests included in the estate. *Integrated Solutions, Inc. v. Service Support Specialties, Inc.*, 124 F.3d 487, 491 (3d Cir.1997); *Cain v. Hyatt*, 101 B.R. 440, 441–42 (E.D.Pa. 1989). A cause of action need not be formally filed prior to the commencement of a bankruptcy case to become property of the estate. *Lawrence v. Jackson Mack Sales, Inc.*, 837 F.Supp. 771, 779 (S.D.Miss. 1992), *aff'd*, 42 F.3d 642 (5th Cir.1994). After a claim becomes part of the bankruptcy estate, only the bankruptcy trustee, as representative of the estate, has the authority to prosecute or settle the cause of action. *Chrysler Credit Corp. v. B.J.M., Jr., Inc.*, 834 F.Supp. 813, 839 (E.D.Pa. 1993); *Cain*, 101 B.R. at 442.

There is no dispute in this case that Plaintiff's claim against Defendant accrued prior to the filing of his bankruptcy petition. When Plaintiff commenced his bankruptcy case, this claim became the property of the bankruptcy estate. Therefore, any claim by Plaintiff against Defendant arising out of the incident that took place on August 23, 1995, no longer belongs to Plaintiff. Rather, it is the property of the bankruptcy estate.

In its Motion for Judgment on the Pleadings, Defendant first argued that this suit should be dismissed because of Plaintiff's apparent lack of standing. While there is much confusion surrounding the distinction between the doctrine of standing and the principle of the real party in interest, it is clear that this suit presents an issue involving the latter.

Generally, standing involves a determination of "whether the plaintiff can show an injury in fact traceable to the conduct of the defendant." *Firestone v. Galbreath*, 976 F.2d 279, 283 (6th Cir.1992)(citing *Allen v. Wright*, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)). Because Plaintiff was the individual who suffered the injury alleged in the Complaint, he meets the requirements of standing. In contrast, the real party in interest principle requires that "Every action shall be prosecuted in the name of the real party in interest." FED.R.CIV.P. 17(a). This principle is a means to identify the person who possesses the right sought to be enforced. *Firestone*, 976 F.2d at 283. Plaintiff is not the real party in interest because, upon the filing of his bankruptcy petition, this claim became the property of the bankruptcy estate and now can only be maintained by the bankruptcy trustee. *See Lawrence*, 837 F.Supp. at 779.

## B. RULE 17(a).

In addition to requiring all actions to be prosecuted in the name of the real party in interest, Rule 17(a) provides:

No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest; and such ratification, joinder, or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest.

FED.R.CIV.P. 17(a). While a literal interpretation of this portion of Rule 17(a) would make it applicable to every case in which an inappropriate plaintiff was named, the Advisory Committee's Notes make it clear that this provision "is intended to prevent forfeiture when determination of the proper party to sue is difficult or when an understandable mistake has been made."[1] FED.R.CIV.P. 17 Advisory Committee Notes, 1966 Amendment; *see also Nelson v. County of Allegheny*, 60 F.3d 1010, 1015 n. 8 (3d Cir.1995); *U.S. for Use and Benefit of Wulff v. CMA, Inc.*, 890 F.2d 1070, 1074 (9th Cir.1989); *Hobbs v. Police Jury of Morehouse Parish*, 49 F.R.D. 176, 180 (W.D.La.1970). When determination of the correct party to bring the action was not difficult and when no excusable mistake was made, the last sentence of Rule 17(a) is inapplicable and the action should be dismissed. 6A Charles Alan Wright, Arthur R. Miller and Mary Kay Kane, *Federal Practice and Procedure* § 1555 (1990) ("Wright & Miller"); *see also Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 20 (2d Cir.1997)(noting that the district court retains discretion to dismiss an action where there was no reasonable basis for naming an incorrect party); *Whitcomb v. Ford Motor Co.*, 79 F.R.D. 244, 245 (M.D.Pa.1978)(noting that Rule 17 contemplates dismissal of an action not prosecuted by the real party in interest). Further,

---

1. For a further discussion of the necessity of an honest mistake in order for a court to permit substitution under Rule 17(a), see

Sherman L. Cohn, *The New Federal Rules of Civil Procedure*, 54 Geo. L.J. 1204, 1238 (1966).

this portion of Rule 17(a) "should be applied only to cases in which substitution of the real party in interest is necessary to avoid injustice." 6A Wright & Miller § 1555; *Automated Info. Processing, Inc. v. Genesys Solutions Group, Inc.*, 164 F.R.D. 1, 3 (E.D.N.Y.1995).

■ Based upon this analysis, it is evident that Rule 17(a) should not be applied blindly to permit substitution of the real party in interest in every case. In order to substitute the trustee as the real party in interest, Plaintiff must first establish that when he brought this action in his own name, he did so as the result of an honest and understandable mistake. The Advisory Committee Notes to Rule 17(a) provide examples of situations in which substitution would not be permissible:

> [This provision] does not mean, for example, that, following an airplane crash in which all aboard were killed, an action may be filed in the name of John Doe (a fictitious person), as personal representative of Richard Roe (another fictitious person), in the hope that at a later time the attorney filing the action may substitute the real name of the real personal representative of a real victim, and have the benefit of suspension of the limitation period. It does not even mean, when an action is filed by the personal representative of John Smith, of Buffalo, in the good faith belief that he was aboard the flight, that upon discovery that Smith is alive and well, having missed the fatal flight, the representative of James Brown, of San Francisco, an actual victim, can be substituted to take advantage of the suspension of the limitation period.

FED.R.CIV.P. 17 Advisory Committee Notes, 1966 Amendment. Therefore, it is necessary for this Court to determine whether or not Plaintiff was acting in good faith when he filed this action in his own name. If Plaintiff did not make an honest and understandable mistake when he filed this action in his own name, this Court will not allow substitution of the real party in interest.

## C. FACTUAL BACKGROUND.

On August 23, 1995, Plaintiff was at his place of employment, Jay Telephone Vending, Inc. While assisting in the unloading of freight delivered by Defendant, Plaintiff allegedly sustained severe injuries. Two to three hours later, Plaintiff went home because he was in pain. After spending four days in bed, he sought medical attention. Plaintiff never returned to work, and he began receiving worker's compensation several months later.

On July 21, 1997, Plaintiff filed a complaint against Defendant based upon the injuries he sustained on August 23, 1995. Trial was set to commence on July 6, 1998. During May of 1998, Defendant became aware that Plaintiff had filed a petition in bankruptcy during 1997. On June 3, 1998, this Court granted Defendant leave to engage in limited discovery on this new issue. This discovery revealed that on January 16, 1997, nearly one year and five months after his injury, Plaintiff filed a Chapter 7 Petition in Bankruptcy. In his petition, Plaintiff listed 82 creditors holding unsecured non-priority claims in the amount of $155,887.54. The petition further disclosed personal property in the amount of $6,125.00. Plaintiff did not, as was required, list his claim against Consolidated Freightways in his bankruptcy petition. Further, when asked by the trustee at the meeting of creditors whether he had "any claims against anyone for any reason whatsoever," Plaintiff replied "nothing." (*See* Pl.'s Post Hr'g Br. Ex. 6 at p. 13.) On April 30, 1997, Plaintiff received a discharge of all of his debts, and his bankruptcy case was closed on May 9, 1997.

Plaintiff immediately sought an attorney to pursue any possible claim he might have against Defendant. In the weeks following the discharge of his debts, Plaintiff contacted four attorneys with respect to this claim. In the second or third week of May, 1997, Plaintiff contacted the attor-

neys who represented him just prior to trial ("trial counsel"). Trial counsel was retained on May 30, 1997.

At a deposition, Plaintiff testified that after his bankruptcy discharge, but prior to retaining trial counsel, he met with the three other attorneys to discuss possible claims against Defendant in this action. He further testified that he never informed any of the three attorneys that he had recently filed a bankruptcy petition.[2] (Dep. of Christopher Feist, 6/12/98, at pp. 112–35.) When asked whether he had informed any attorney from the trial counsel firm of his bankruptcy, Plaintiff asserted the attorney-client privilege and refused to answer. (*Id.* at pp. 126–27.) Similarly, at the deposition of trial counsel, Plaintiff (through other counsel) again asserted the attorney-client privilege when his trial counsel was asked if Plaintiff had ever informed him of the bankruptcy petition.[3] (Dep. of trial counsel at pp. 22–26.)

Plaintiff gave various reasons at his depositions and at the evidentiary hearing as to why he waited until nearly two years after the date of his accident to see an attorney. When asked at his first deposition why he decided to see an attorney in May of 1997, Plaintiff responded that it was because he "got to a point of just utter frustration and realizing I wasn't getting better and the doctors weren't able to do anything for me and I just realized that my life could be like this for as long as I'm alive." (Dep. of Christopher Feist, 3/18/98, at pp. 143–44.) At his later deposition, Plaintiff testified that he did not pursue a claim against Defendant sooner because "[t]he whole concept of having a claim against Consolidated Freightways didn't even enter my mind at that point." (Dep. of Christopher Feist, 6/12/98, at p. 93.) At the hearing, Plaintiff testified "I had no idea I could sue anybody. I mean, first of all, that wasn't my main focus, and second-

ly, I just thought I was receiving workers' comp and that was my rights, that was it." (N.T. 11/19/98 at pp. 25–26.)

## D. DISCUSSION.

In evaluating the evidence relevant to the issue of whether or not Plaintiff filed this Complaint in good faith, the timing of particular events plays a crucial role. Plaintiff incurred the majority of his debt prior to 1994. While his Chapter 7 petition filed in 1997 lists claims in excess of $155,000.00, more than $145,000.00 of that amount was incurred in 1993 or earlier. It is remarkable that, given this substantial amount of debt, Plaintiff waited until 1997 to file his bankruptcy petition.

When asked what led him to file the bankruptcy petition, Plaintiff testified at his deposition: "Well, I had planned on maybe applying for relief under the bankruptcy law for a couple of years before this. . . . I kept putting it off because I thought maybe some how, some way, I'd get things together and be able to take care of it." (Dep. of Christopher Feist, 6/12/98, at pp. 10–11.) At the evidentiary hearing, Plaintiff's counsel argued:

> If Mr. Feist wanted to get rid of his creditors from '91 to '93, and if it only takes four, five months to get rid of them, he would have gone and filed the bankruptcy in 1993 or 1994 or 1995, and there never would have been a creditor problem later. Instead what he did was the other thing. He tried to pay them.

(N.T. 11/19/98 at p. 112.) Thus, Plaintiff contends that despite the fact that the vast majority of his debt was incurred prior to 1994, he delayed filing bankruptcy until 1997 because he was attempting to repay his creditors.

But Plaintiff's own testimony casts doubt upon this purported reason for the delay. At his deposition, Plaintiff testified that he had stopped making payments to

---

**2.** At the deposition, Feist also discussed his communications with his bankruptcy attorney. (Dep. of Christopher Feist, 6/12/98, at pp. 69–88.)

**3.** The Court was never asked to rule on these claims of attorney-client privilege.

the vast majority of his creditors in 1992 or 1993. (Dep. of Christopher Feist, 6/12/98, at p. 29.) Plaintiff shed further light upon his intentions regarding his debts when he was asked if he had notified his creditors of a change in his address:

Q: I guess what I want to know, though, Mr. Feist, is to the extent the creditors were corresponding with you in Vegas, at some point you left Vegas and you moved back home to Philadelphia. Did you notify those creditors so that they could continue to correspond with you in Philadelphia?

A: Well, by that time I had already talked to my creditors and told them that I can't pay the debts.

Q: So is the answer no, that you didn't notify them?

A: I don't recall if I did or not, because I never actually changed anything beyond talking to them and telling them I couldn't pay the debts. Mostly all of them got in touch with me.

Q: I'm sure they did.

A: And I told them all the same thing. I can't pay the debts.

Q: And this would be in 1992–'93?

A: And I told them to stop calling me and harassing me, things of that nature. And by law, they had to stop doing that.

(*Id.* at pp. 38–39.) Based upon his own testimony, Plaintiff did not notify his creditors that he had moved to Philadelphia.[4] Indeed, he had informed his creditors that he was unable to repay them. It seems rather unlikely, then, that Plaintiff intended to repay his creditors when he had already informed them that he would not pay his debts and had failed to notify them of his change of address. Further, the fact that Plaintiff told his creditors to stop calling him because he knew that "by law, they had to stop doing that" shows a certain amount of sophistication on his part regarding management of his debts.

Thus, it is doubtful that Plaintiff delayed his bankruptcy petition because he was attempting to repay his creditors. It is more likely that Plaintiff never previously filed for bankruptcy because he had no assets to protect. When he was injured on August 23, 1995, Plaintiff acquired what he believed was a valuable asset—his claim against Defendant. Despite any previous occasions on which Plaintiff considered filing a bankruptcy petition, it was only after his acquisition of this asset that he actually sought relief in bankruptcy court.

The aggressiveness with which he pursued this litigation immediately after his bankruptcy case was closed also raises questions about Plaintiff's intent. Plaintiff testified that within the three weeks following the close of his bankruptcy case he spoke with four different attorneys regarding a possible claim against Defendant. Within just a few weeks he had retained counsel and filed a lawsuit. In contrast, during the first one year and eight months following his injury, he did not speak with a single attorney regarding potential claims against Defendant. It was only after his substantial debts were discharged by the bankruptcy court that Plaintiff actively pursued this claim.

---

4. Plaintiff actually testified that the word "move" did not accurately describe the way in which he was "predominantly spending a lot of time in Philadelphia" beginning in August, September, or October of 1993. (*See* Dep. of Christopher Feist, 6/12/98, at pp. 32, 40.) Rather, he maintained that he was perpetually transient, alternately or simultaneously living in Las Vegas, Salt Lake City, and Philadelphia:

Q: Where was your residence at that point in time, spring of '92?

A: What do you mean my residence?

Q: Where you were living, where you could vote.

A: Well, I didn't vote during those years, because my main residence is in Pennsylvania. I went out there [Las Vegas and Salt Lake City] to do some business. And when I was out there, I stayed in different places. I had a place, you know, that I stayed in Vegas. I had a place that I stayed in Utah. And I had a place that I stayed in Pennsylvania.

(*Id.* at p. 36.)

The questions that are naturally raised by the swiftness with which Plaintiff sought legal representation after his bankruptcy case was closed are not fully answered by Plaintiff's testimony. When asked at his first deposition what led him to seek an attorney, Plaintiff testified:

A: Well, it was mostly the fact what that guy did that day with the trucking company, the whole way he orchestrated what we were going to do, how we were going to do it, how much of a hurry he was in. . . .

Q: I understand what you're saying and your reasons for pursuing the claim. I guess my question goes to the timing of it. Why in May of '97 were you making that decision?

A: Well, by May of '97 it had already been close to well past a year, and my first reaction to this whole thing which dominated what happened to me, which dominated how I felt after it happened to me, was just to hide in the corner and just isolate myself and just try to handle it myself. When I got to a point of just utter frustration and realizing I wasn't getting better and the doctors weren't able to do anything for me and I just realized that my life could be like this for as long as I live. . . .

Q: At some point in time you came to the conclusion that this trucker orchestrated the situation?

A: I knew that from the beginning. The thing was I was hoping to get better and as time went on I got so depressed and isolated myself to such an extent. I didn't want to try to get involved in the courts or go after anybody.

(Dep. of Christopher Feist, 3/18/98, at pp. 142–45.) At his second deposition, Plaintiff stated that he did not list this claim on his bankruptcy petition because he "had no knowledge of having any claim against anybody other than receiving workers' comp." (Dep. of Christopher Feist, 6/12/98, at p. 91.) Plaintiff went on to testify that he did not believe he had any claim against Defendant until May of 1997,

following a conversation with his uncle. (*Id.* at pp. 93–98.) At the evidentiary hearing, Plaintiff gave more details as to the events leading up to his decision to seek an attorney after his worker's compensation carrier scheduled an independent medical examination:

Once I found out about that [the medical examination], I talked to my uncle when I had seen him one day or talked to him on the phone one day and I said to him, said, you know, what am I going to do about workers' comp? I said, you know, I don't know what they are going to try to do to me or what, and I'm really scared because I'm not getting any better. I said and I have read about this in like this thing I saw, this pamphlet, and I said what do I do, what should I do. And he said it might be a good idea to call an attorney and start asking some questions about that and the other—and the other thing. And I said to him what other thing, and he said the trucking company, the third-party thing or something like he said. And I said what are you talking about, and he said maybe you have a third-party case or something to that effect. And I said do you really think I do? And I was very surprised, you know that he said that and he said, it doesn't hurt to ask.

(N.T. 11/19/98 at p. 32.) Thus, Plaintiff maintained at the hearing that actions taken by his worker's compensation carrier prompted a conversation with his uncle that led him to interview attorneys.

While Plaintiff's testimony at the second deposition and his testimony at the hearing do not directly contradict his testimony at the first deposition, it is somewhat puzzling that the only reason he originally gave for his delay in seeking an attorney was that he "didn't want to try to get involved in the courts or go after anybody." Yet, after Defendant discovered that Plaintiff had filed a bankruptcy petition, Plaintiff testified at the second deposition and at the hearing that his delay was also caused by the fact that he did not

**280**

believe he had any claim against Defendant until May of 1997. He further testified that a conversation with his uncle prompted his search for an attorney, a fact that he did not state at his first deposition despite the fact that he was asked what led him to seek an attorney.

■ Evaluating all of the evidence presented, it is clear that Plaintiff has not sustained his burden of proving that when he filed this action in his own name, he did so in good faith. Plaintiff's lack of interest in filing a petition in bankruptcy for several years until after he had acquired what he believed was a significant asset makes his stated intentions appear dubious. His subsequent failure to list this claim as an asset in his bankruptcy petition further adds to suspicions about his motivation. Moreover, Plaintiff began an aggressive search for an attorney immediately after his bankruptcy case was closed. The timing of these actions by Plaintiff certainly gives the Court reason to doubt that when he finally did bring this action in his own name, he did so as the result of an honest mistake.

Plaintiff's explanations fail to eliminate these doubts. His testimony as to the reason for his delay in filing bankruptcy is contradicted by other testimony in the record. He offered additional reasons to explain his delay in filing this case only after Defendant discovered his bankruptcy. Further, while Plaintiff readily provided testimony that he never told the three attorneys he previously interviewed in May of 1997 about his bankruptcy case, he did not answer that question as to his present counsel. Thus, I find that Plaintiff has failed to carry his burden to prove that the filing of this case in his own name was an honest mistake. Plaintiff will not be permitted to substitute the trustee as the real party in interest. To allow a substitution where a plaintiff cannot establish that he was acting as the result of an honest mistake would contravene the purpose of Rule 17(a).

The bankruptcy trustee contends (along with Plaintiff) that if substitution is not permitted in this case, it is Plaintiff's creditors who will suffer most, as they received nothing during his original bankruptcy case and could receive nothing now. These concerns were raised by Judge Stapleton in *Oneida Motor Freight, Inc. v. United Jersey Bank,* 848 F.2d 414, 422 (3d Cir.1988)(Stapleton, J., dissenting). The *Oneida* case is similar in some ways to the case now before this Court. In *Oneida,* a Chapter 11 debtor failed to disclose to the bankruptcy court a potential claim against one of its creditors. After the court confirmed the debtor's reorganization plan, the debtor brought an action against the creditor. The court of appeals, in affirming dismissal of the case, found that the debtor's failure to disclose its potential claim during its bankruptcy case precluded a later independent action on the claim by the debtor. *Id.* at 419. Further, the court held that the debtor was judicially estopped from bringing its claim because its suit indicated a position contrary to that taken by the debtor in its Chapter 11 case. *Id.* Despite the concerns raised by the dissent that it produced a harsh result for the creditors, the court held that the debtor was not permitted to bring its claim. *Id.* at 420. Thus, the interest of Plaintiff's creditors in recovering some of the debts owed to them is not sufficient to justify substitution of the bankruptcy trustee as the real party in interest in this case.

### E. CONCLUSION.

Plaintiff has failed to sustain his burden of proof which required that he demonstrate that when he filed this action in his own name it was the result of an honest mistake. This Court will not come to the aid of a plaintiff under circumstances such as this where plaintiff cannot prove that his prior actions were done in good faith. Because the Plaintiff is not the real party in interest, he is unable to state a claim upon which relief can be granted. There-

fore, Defendant's Motion for Judgment on the Pleadings will be Granted.

I therefore enter the following Order.

### ORDER

AND NOW, this day of March, 1999, upon consideration of Plaintiff's Motion to Substitute the Trustee in Bankruptcy as the Real Party in Interest, and all responses thereto, and Defendant's Motion for Judgment on the Pleadings, and all responses thereto, it is hereby ORDERED that:

1. Plaintiff's Motion is DENIED;

2. Defendant's Motion is GRANTED;

3. all other outstanding Motions are DENIED as moot;

4. the Clerk of Court is directed to mark this case CLOSED.